

## NUMBER 13-19-00411-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

### IN THE INTEREST OF M.B. AND M.B., CHILDREN

**On appeal from the County Court at Law
of Aransas County, Texas.**

# MEMORANDUM OPINION
**Before Justices Benavides, Longoria, and Perkes
Memorandum Opinion by Justice Benavides**

By two issues, appellant K.B., whose parental rights to M.B. (M.B.1) and M.B. (M.B.2),[1] were terminated, challenges the legal and factual sufficiency of the evidence supporting the grounds for termination and supporting a finding that termination was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O).

---

[1] To protect the identity of the minor children who are the subject of this appeal, we refer to the parties by their initials. *See* TEX. R. APP. P. 9.8; TEX. FAM. CODE ANN. § 109.002(d). Two of the children, have the same initials and no known middle names. We refer to the elder as M.B.1 and the younger as M.B.2.

K.B.'s parental rights to a third child, D.B. were not terminated.    We affirm.

## I.    BACKGROUND

### A.    Removal

In May 2018, the Department of Family and Protective Services (the Department) filed a petition seeking conservatorship of three children, D.B., M.B.1, and M.B.2, ages fifteen, fourteen, and twelve, respectively.    Their father is R.B.    D.B. and M.B.2 were removed after K.B. overdosed on prescription pills and was hospitalized on April 20, 2018. M.B.1 was staying with R.B. at the time.    Until M.B.2 called the local police department on April 27, 2018, while K.B. was hospitalized, the two children had been left in the care of their paternal grandfather and their mother's boyfriend, both of whom drank excessively and were threatening towards them.    M.B.2 reported to the local police department that they did not know how long K.B. would be gone or where she was hospitalized.

Before K.B.'s overdose, the children lived with their mother and paternal grandfather in a trailer on a rural plot of land near Rockport.    K.B. also shared a shack on the property with her boyfriend.    Neither the trailer nor the shack had electricity or running water after they were damaged by Hurricane Harvey.    Hurricane Harvey hit the area on August 26, 2017.    About a month after Hurricane Harvey, K.B. received $15,000 from FEMA to make repairs but admitted that her father used the money "for things they needed" and not for repairs.    Eight months later, she had not made any repairs or restored utilities.    Instead she used her car and a converter to make electricity for the trailer on a part-time basis.    The social worker also observed "large amounts of trash and debris from their home and sheds [that were] destroyed by Hurricane Harvey scattered throughout the property [that] pos[ed] a safety and sanitary hazard" to the

2

children.  When the social worker interviewed K.B., she admitted to using methamphetamine within a week before the children were removed.

The trial court heard evidence that K.B. and two of the children have mental health issues.  K.B. was diagnosed with bipolar disorder and depression.  D.B. and M.B.1 are both intellectually impaired.  Both D.B. and M.B.1 had been cutting themselves, and D.B. had expressed thoughts of suicide for a year before removal.  In addition, D.B. had been diagnosed with bipolar disorder, attention deficit disorder, and depression.  At the time the children were removed, D.B. was out of medication and K.B. had not taken her for follow up appointments at the local Mental Health and Mental Retardation facility.  The school counselor had made numerous referrals for counseling for both children, but K.B. had not taken them.  M.B.2 reported that K.B. became physically abusive towards D.B. and M.B.1 for telling school personnel anything about themselves or their home life.  K.B. received social security and Medicaid benefits based upon D.B.'s disability.

R.B. moved to San Angelo when he separated from K.B., but the date he moved was not clear from the record.  M.B.1 was with him when K.B. overdosed.  When R.B. was contacted by the Department in late April 2018, M.B.1 had been missing for approximately 30 hours.  Although she returned home safely and reported that she had been at her boyfriend's home, the Department was concerned.  After an investigation in San Angelo, the Department removed M.B.1.  R.B. admitted to using intravenous methamphetamine and had been for some time.  R.B. lives with his mother and his mentally ill and sometimes violent brother who punched holes in the wall when he became angry.  R.B.'s residence was dirty with large holes in the walls and with sheets hung as dividers between rooms.  There was a large glass cabinet at the house in which

medicines and chemicals were stored that was accessible to M.B.1.

**B.      Prior History With the Department**

In 2005, the Department received a report that K.B. physically abused her two eldest children by punching them, neglected them by failing to bathe them, and the children had lice and sores on their heads.   The allegation of physical abuse was ruled out.

In 2006, the Department received a report that a thirteen-year-old cousin inappropriately touched D.B., who was four years old at that time.   D.B. was examined and unusual bruises were found on her body.   Both D.B. and M.B.1, who was three, appeared to be developmentally delayed and were unable to communicate what happened.   The family participated in services and was cooperative.   The Department was "unable to determine" the truth of the sexual abuse allegation although they ruled out any physical abuse.

In 2007, the Department received another report of physical abuse to D.B. who had a purple bruise on her swollen cheek.   D.B. also cringed if a hand was raised as if to strike her.   Home conditions were poor at the time of the investigation.   However, physical abuse was ruled out when D.B. indicated she had fallen and her pediatrician expressed no concern.

Four months later in 2008, the Department received a report that R.B. was manufacturing drugs and that K.B. and R.B. were using drugs and placing the children at risk.   Another report of physical abuse and medical neglect was received a few days later.   Medical neglect was ruled out after an investigation confirmed that the children were seen regularly by their pediatrician.   The Department found reason to believe

4

neglectful supervision but ruled out physical abuse by K.B. and the paternal grandfather. However, the Department found reason to believe that physical abuse by R.B. had occurred.

In February 2009, the Department received another referral alleging that the children lived in unsanitary conditions and received inadequate physical care and supervision. At this time, all of the children had visible head lice. Drug use by both K.B. and R.B. was reported along with reports of other drug users present on the property. K.B. drug tested clean between June 2009 and March 2010. Shortly thereafter another referral alleged that D.B. had multiple bruises on her legs of unknown causes. The Department was unable to determine allegations of neglectful supervision, physical abuse and neglect, and sexual abuse. In April 2010, the Department again ruled out physical abuse to the children.

In 2014, the Department received a report of possible sexual abuse of the children based upon alleged sexual acting out by M.B.1. The Department investigated and ruled out sexual abuse.

In March 2018, the Department received a referral alleging that the adults were unable to control the children, that D.B. was suicidal, and that M.B.1 kicked and pushed her grandmother which resulted in a referral to Adult Protective Services (APS). The APS referral was closed with no services needed.

## C. Post-Removal

The children were initially separated from each other. D.B. was placed in a foster home in Waco and the other children were placed in Pearland. By October 2018, the children were placed together in their aunt's home in Odessa, Texas.

Over the next few months, K.B. participated fully in her service plan, including drug treatment. With the Department's help, she obtained a new, safe trailer, and obtained utilities on the rural property where she had been living. Her former boyfriend left the property. K.B. found a job and remained employed. She visited the children in Odessa and spoke to them regularly.

By January 2019, the trial court found that K.B. had demonstrated adequate and appropriate compliance with her service plan, but the children remained in Odessa with their aunt. In March 2019, the trial court retained D.B.'s placement in Odessa at D.B.'s request,[2] but returned M.B.1 and M.B.2 to K.B. who had obtained safe, sanitary, and appropriate housing and had maintained her sobriety for seven months.

The Department continued to monitor the children. Approximately two weeks later, M.B.1 called the police to report possible sexual abuse of M.B.2 by K.B.'s new boyfriend. Although M.B.2 initially denied any sexual abuse, the children were removed while the Department investigated. In July, M.B.2 made an outcry that K.B.'s boyfriend had forced her to perform oral sex on him. A review of M.B.2's cell phone revealed text messages between M.B.2 and K.B.'s boyfriend that the Department caseworker described as "grooming." K.B. had given her boyfriend M.B.2's cell phone number at his request. The children were removed in April 2019 and returned to their aunt's home in Odessa.

---

[2] D.B. was being homeschooled by her aunt and wanted to remain in Odessa to complete high school. She was seventeen at the time. Her proceedings were severed from those of her siblings, and this appeal does not affect her status.

K.B. tested positive for marijuana approximately two weeks after the children were removed. In June 2019, K.B. tested positive for both marijuana and for methamphetamine. The Department offered relapse services and treatment that K.B. rejected.

Until the children were removed the second time, the Department's goal was family reunification with K.B. After that, the Department sought termination of K.B.'s parental rights under subsections D, E, and O and in the best interest of the children. TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O). The termination trial was held on August 20, 2019, after which the trial court terminated the parental rights of both K.B. and R.B. The order of termination was entered and this appeal by K.B. ensued. R.B. did not appeal.

## II. SUFFICIENCY OF THE EVIDENCE

By her first issue, K.B. makes a general challenge to the legal and factual sufficiency of the evidence for each ground for termination.

## A. Standard of Review

"Because the natural right between a parent and his child is one of constitutional dimensions, termination proceedings must be strictly scrutinized." *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014) (internal citations omitted) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980)). Due process in these cases "requires application of the clear and convincing standard of proof." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). The family code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN.

7

§ 101.007. This heightened standard of proof carries the weight and gravity due process requires to protect the fundamental rights at stake. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). "[D]ue process also requires a heightened standard of review of a trial court's finding under section 161.001(b)(1)(D) or (E), even when another ground is sufficient for termination, because of the potential consequences for parental rights to a different child." *In re N.G.*, 577 S.W.3d at 235.

"Because of this high evidentiary burden at trial, we have concluded that appellate review in parental termination cases also warrants a heightened standard of review." *In re N.G.*, 577 S.W.3d at 235 (citing *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *In re A.C.*, 560 S.W.3d at 630. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* "If the reviewing court determines that no reasonable factfinder could form a firm belief or conviction that the matter to be proven is true, then the court must conclude that the evidence is legally insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

"In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief

or conviction that the finding was true." *Id.*

**B. Endangerment**

The trial court found that K.B. "failed to provide a safe environment for the children, exhibited a lack of protective capacity, . . . engaged in substance abuse and failed to comply with [the] court-ordered plan." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), O.

To endanger is "to expose to loss or injury or jeopardize a child's emotional or physical health." *In re N.T.*, 474 S.W.3d 465, 476 (Tex. App.—Dallas 2015, no pet.). A parent may endanger a child either by acts or omissions that need not be directed at the child and it is not necessary that a child actually sustain an injury. *In re M.C.*, 917 S.W.2d 268, 271 (Tex. 1996); *In re N.T.,* 474 S.W.3d at 476. "[W]e are to consider the child's environment before the Department's removal of the child." *In re M.D.M.*, 579 S.W.3d 744, 767 (Tex. App.—Houston [1st Dist.] 2019, pet. granted.); *see In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The distinction between subparts (D) and (E) is the source of the endangerment. Subpart (D) addresses the child's environment and subpart (E) addresses the conduct of the persons around the child. *In re N.T.*, 474 S.W.3d at 476; *In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.— Dallas 2014, no pet.).

**1. Endangerment Due to a Child's Environment**

"'Environment' refers to the acceptability of living conditions, as well as a parent's conduct in the home." *In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Inappropriate, abusive, or unlawful conduct by a parent or other persons

who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subpart D. *See In re J.E.M.M.*, 532 S.W.3d at 881 (holding that evidence that father did not live with mother and child and failed to protect the child from the mother's drug use and abusive conduct was sufficient to show endangerment); *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (same). Termination under § 161.001(b)(1)(D) is permitted "because of a single act or omission." *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 713 (Tex. App.—El Paso 2012, no pet.); *see In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

At the time the children were removed, they had been living in a hurricane-damaged trailer without electricity or running water. Even though K.B. had received government monies to repair the trailer eight months earlier, she used the money for other things and failed to make repairs, clean up the property, or obtain utilities. In addition, K.B. was mentally unstable, had overdosed, and had been hospitalized. The children did not know where she was or how long she would be gone. The children were left in the care of their eighty-two year old grandfather who drank alcohol to excess and threatened to strike the girls when he was drunk.

In the month before the children were removed, K.B. had chased her live-in boyfriend with a knife until M.B.2 called the police. Two of K.B.'s daughters had made suicidal outcries and had engaged in cutting behavior, but K.B. did not take them for mental health appointments or get the medication prescribed for them.

Furthermore, the children had long-term hygiene issues, indicating neglect. The school district had been ordered to allow M.B.1 to shower at school three days a week, and in 2017 M.B.1 also had a chronic lice infestation with severely matted hair. Years before, all three children had severely matted hair and lice infestations.

K.B. had been physically abusive to her daughters by slapping them. K.B.'s boyfriend drank heavily, a bottle of whiskey a day, and lived on the property in a shack he shared with K.B. while her children lived in the trailer with their grandfather.

K.B. failed to care for her own mental health issues, and she failed to care for her children's mental and physical health which endangered them. K.B. admitted to methamphetamine use. The conditions of the property at the time of removal, K.B.'s drug use, as well as K.B.'s failure to protect her daughters from her own erratic behavior and that of her father and boyfriend supported removal of the children under § 161.001(b)(1)(D).[3] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

### 2. Endangerment by Parental Course of Conduct

"Termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied). A court may properly consider actions and inactions that occurred both before and after a child's birth to establish a "course of conduct." *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—

---

[3] Subsection 161.001(b)(1)(D) provides that a parent "knowingly placed or knowingly allowed the child. to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

Houston [14th Dist.] 2017, pet. denied); *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). "The specific danger to the children need not be established independently, but rather may be inferred from the parental misconduct." *Porter v. Tex. Dep't of Protective & Regulatory Servs.*, 105 S.W.3d 52, 58 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.). As a general rule, subjecting children to a life of uncertainty and instability endangers the children's physical and emotional well-being. *See In re A.R.O.*, 556 S.W.3d 903, 910 (Tex. App.—El Paso 2018, no pet.); *In re C.J.S.*, 383 S.W.3d 682, 689 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

K.B.'s substance abuse and connection with other substance abusers dates back to when the children were young. Her failure to maintain hygiene for the children also dates back approximately ten years based upon Departmental records of head lice and severely matted hair for all three children in 2005, 2009, 2017, and 2018. There have been previous allegations of sexual abuse as to K.B.'s children that have been difficult to verify due to the children's ages allegedly perpetrated by relatives or close friends which should have made her aware of the need to be protective. One part of K.B.'s service plan was for her to notify the Department of persons who would be spending time with the children, which she failed to do. K.B. failed to protect M.B.2 from her boyfriend's sexual abuse, and K.B. failed to believe M.B.1 who first reported the abuse. Additionally, K.B.'s resumed drug use endangered the children's well-being, both physically and emotionally. *See In re A.S.*, 394 S.W.3d at 712. A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re*

12

*J.J.L.*, 578 S.W.3d 601, 611 (Tex. App.—Houston [14th Dist.] 2019, no pet.). "Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct. Further, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child." *In re A.J.H.*, 205 S.W.3d 79, 81 (Tex. App.—Fort Worth 2006, no pet.); *see also In re D.J.E.*, No. 13-08-00349-CV, 2008 WL 5196608, at *4 (Tex. App.—Corpus Christi–Edinburg Dec. 11, 2008, no pet.) (mem. op.).

We find that the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations that K.B.'s conduct and the environment in which she placed the children endangered the children's physical and emotional well-being. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E);[4] *In re A.B.*, 437 S.W.3d at 502. Because we hold the evidence of endangerment pursuant to §§ 161.001(b)(1)(D), and (E) to be both legally and factually sufficient, we need not address the remaining ground. *See In re N.G.*, 577 S.W.3d at 236 n.1; *In re A.V.*, 335 S.W.3d 355, 361 (Tex. 2003); *see also* TEX. R. APP. P. 47.1.

We overrule K.B.'s first issue.

### III. BEST INTEREST OF THE CHILDREN

By her second issue, K.B. challenges the legal and factual sufficiency of the evidence to support the trial court's finding that the children's best interests would be

---

[4] Subsection 161.001(B)(1)(E) provides that a parent has "engaged in conduct or knowingly placed the child. with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

13

served by terminating K.B.'s parental rights. The standards of review outlined in Part II(A) apply to this issue as well.

"[T]here is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, clear and convincing evidence to the contrary may overcome that presumption." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). A best-interest determination is guided by several non-exclusive factors, including: (1) the child's emotional and physical needs; (2) the emotional and physical danger to the child now and in the future; (3) the parental abilities of the individuals seeking custody; (4) the plans for the child by those individuals and the stability of the home; (5) the plans for the child by the agency seeking custody and the stability of the proposed placement; (6) the parent's acts or omissions that may indicate the existing parent child relationship is improper; and (7) any excuse for the parent's acts or omissions. *In re A.C.,* 560 S.W.3d at 631. "Proof of acts or omissions providing grounds for termination under section 161.001(b)(1) does not relieve the petitioner from proving the best-interest element, but the same evidence may be probative of both." *Id.* at 631–32.

## A.    Children's Needs

The children were sixteen and twelve years old at the time of trial. They were removed just over a year before trial, but had maintained telephone contact with both K.B. and R.B. K.B. also visited the children in Odessa. Their visits were appropriate and the children enjoyed their time with K.B.. However, both children advised their ad litems that they wished to be adopted and to remain in the kinship placement with D.B. in Odessa. The need for permanence is a paramount consideration for a child's present

14

and future physical and emotional needs. *In re D.A.Z.*, No. 08-18-00124-CV, ___ S.W.3d ___, 2018 WL 6722338, at *4 (Tex. App.—El Paso Dec. 21, 2018, no pet.); *In re R.A.G.*, 545 S.W.3d 645, 653 (Tex. App.—El Paso 2017, no pet.).

Although K.B. had obtained safe housing and was employed at the time of trial, the children had been removed again because K.B. had failed to protect M.B.2 from sexual assault by K.B.'s boyfriend and had failed to believe M.B.1 when she reported the assault to her mother. In addition, K.B. had resumed using illegal drugs. *See In re J.O.A.*, 283 S.W.3d at 346; *see also In re H.R.M.*, No. 07-18-00430-CV, 2019 WL 1321226, *4 (Tex. App.—Amarillo Mar. 22, 2019, pet. denied) (mem. op.) (affirming finding of best interest where mother relapsed into substance abuse before final hearing). Despite the children's love for and desire to continue their relationship with K.B., this factor weighs in favor of termination.

## B. Emotional and Physical Danger to the Children Now and in the Future

Although K.B. completed her family services program and the children had been returned to her, she disregarded the need to protect the children from sexual abuse. K.B. entered into a relationship with a man, exposed her children to him on overnight stays, and failed to notify the Department which could have told her that the man had been investigated for sexual abuse of his teenage step-daughters. K.B. knew that two of her three children had previously been sexually abused by relatives or friends which should have made her very aware of the potential danger. In addition, K.B. gave her new boyfriend M.B.2's phone number at his request which should have caused her concern. He used the cell phone to begin grooming M.B.2 for sexual encounters according to the social worker who reviewed the text messages between them. After

15

the children were first removed, K.B. returned to using drugs and rejected efforts by the Department for her to resume services. Because K.B. had previously failed to protect the children and previously used drugs, the trial court could infer that her failure to protect the children and her resumed drug use would continue to pose a danger to the children. *See In re D.A.Z.*, 2018 WL 6722338, at *4 ("A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent."); *In re R.A.G.*, 545 S.W.3d at 653; *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied). This factor weighs in favor of termination.

## C. Proposed Placement

The children are placed with their aunt, a prospective adoptive family. D.B. continues to live there too. The children have adjusted well, are doing well in school, have bonded with the foster family, expressed a desire to be adopted by them and the children stated that they feel safe with this family. "Evidence that a child is well-cared for by the foster family, [and] is bonded to the foster family" is relevant to the best interest determination." *See In re R.A.G.*, 545 S.W.3d at 653; *In re J.W.M.*, 153 S.W.3d 541, 548–49 (Tex. App.—Amarillo 2004, pet. denied) ("While the prospect of adoption into a stable home cannot alone be said to be a determinative factor, it clearly is among the factors the court properly could consider."). This factor weighs in favor of termination.

## D. Parental Acts, Omissions, and Excuses

For years, K.B. subjected her children to an unstable and unsafe environment by failing to maintain a safe, sanitary, drug-free, and appropriate environment for her children that was free of violence or the threat of violence. She failed to provide for their medical needs or to take care of her own. After the children were removed, K.B. maintained her

16

sobriety for seven months and, with help from the Department, obtained safe and appropriate housing. With help, she also obtained medication for her own mental health needs, appeared to be compliant with her prescription regimen, and secured and maintained employment. However, she relapsed to drug use after the children were removed a second time and refused services. *See In re J.O.A.*, 283 S.W.3d at 346 ("[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices."); *In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.) (holding that evidence of drug use during the course of termination proceedings is relevant to parenting abilities); *see also In re B.D.M.*, No. 02–13–00388–CV, 2014 WL 1510131, at *8 (Tex. App.—Fort Worth Apr. 3, 2014, no pet.) (mem. op.) ("[R]ecent improvement alone is not sufficient to avoid termination of parental rights."). This factor weighs in favor of termination.

## E.     Summary

Considering all of the evidence in the light most favorable to the trial court's verdict, we conclude that the evidence is legally sufficient because a reasonable trier of fact could form a firm belief or conviction that termination was in the best interest of both children. *See In re J.F.C.*, 96 S.W.3d at 266. We conclude the evidence is also factually sufficient because the disputed evidence is not so significant it would prevent a reasonable factfinder from forming a firm belief or conviction that termination was in the children's best interests. *See In re P.R.W.*, 493 S.W.3d 738, 747 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.).

K.B.'s second issue is overruled.

17

## IV. CONCLUSION

We affirm the judgment of the trial court.

GINA M. BENAVIDES,
Justice

Delivered and filed the
14th day of November, 2019.